UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
VOICE TELE SERVICES INC.,

        Plaintiff,

  -against-

SMS CONSORTIUM, LLC,

        Defendant.
-----------------------------------------------------X

MEMORANDUM
AND ORDER

19 CV 3335 (RPK)(RML)

LEVY, United States Magistrate Judge:

        Defendant SMS Consortium, LLC ("defendant" or "SMS") moves for leave to amend its answer and assert counterclaims pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure. I heard oral argument on March 4, 2020. (See Transcript of Proceedings held on Mar. 4, 2020 ("Tr."), Dkt. No. 35.) For the reasons stated below, defendant's motion is granted.[1]

## BACKGROUND

        Plaintiff Voice Tele Services Inc. ("plaintiff" or "VTS") brought this diversity action in June 2019, and has twice amended its complaint.[2] (See Amended Complaint, dated

---

[1] The Federal Magistrate's Act empowers magistrate judges to make rulings as to non-dispositive pretrial matters. See 28 U.S.C. § 636(b)(1)(A)(enumerating dispositive matters subject to de novo review and not including motions to amend). "The weight of opinion appears to favor treating such rulings as nondispositive, requiring a 'clearly erroneous' standard of review." Sokol Holdings, Inc. v. BMB Munai, Inc., No. 05 CV 3749, 2009 WL 3467756, at *4 (S.D.N.Y. Oct. 28, 2009); accord Fielding v. Tollaksen, 510 F.3d 175, 178 (2d Cir. 2007) (referring to motion to amend a complaint as a nondispositive motion); Kilcullen v. New York State Dep't of Transp., 55 F. App'x 583, 584 (2d Cir. 2003) (same); Berrio v. City of New York, 2018 WL 2388537, at *1 n.1 (S.D.N.Y. May 9, 2018) (same, and collecting cases).

[2] I note that, according to the Second Amended Complaint, plaintiff is a Pennsylvania corporation, and defendant is "a Pennsylvania limited liability company with offices located at
                                                                                                         (Continued….)

July 2, 2019, Dkt. No. 12; Second Amended Complaint, dated Sept. 19, 2019 ("Second Am. Compl."), Dkt No. 23.) It asserts New York state law claims for breach of contract, account stated, and unjust enrichment. (See generally Second Am. Compl.)

Plaintiff alleges that on November 2, 2018, VTS entered into a Reciprocal Carrier Services Agreement (the "Agreement") to provide telecommunication services for SMS. (Id. ¶¶ 1, 6, 19-20, Ex. 1.) Specifically, international phone calls pass through several telecommunication routes, known as "pipelines," before reaching their final destination, all of which occurs in fractions of seconds. (See Defendants' Letter Motion to Amend, dated Jan. 21, 2020 ("Defs.' Mot."), Dkt. No. 27, at 1.) VTS alleges that it sold SMS access to one of its pipeline routes for calls to pass through to Morocco. (See id., Second Am. Compl., Ex. 1.) SMS allegedly re-sold this route to its customer Prime Global Communications (UK) Ltd. ("Prime"). (Answer to Amended Complaint, dated Oct. 2, 2019 ("Answer"), Dkt. No. 24, ¶ 1.) The Agreement between VTS and SMS ended on January 31, 2019. (Def.'s Mot. at 1-2.)

VTS sent out four invoices in total under the Agreement (the "Four Invoices"). The first invoice was in November 2018 for $188,010.19; the second invoice was in December

---

1303 53rd Street, Suite 103, Brooklyn, New York." (Second Am. Compl. ¶¶ 4, 5.) In its answer, defendant states: "SMS admits that SMS is a Pennsylvania limited liability company; but denies that it has offices at 1303 53rd Street, Suite 103, Brooklyn, NY." (Answer, Dkt. No. 24, ¶ 5.) It states that it "merely has a mailbox at this address for correspondence and mailing purposes." (Id.)

A limited liability company "takes the citizenship of each of its members." Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 49 (2d Cir. 2012). It is well-settled that federal diversity jurisdiction requires complete diversity among the adverse parties; i.e. it exists only when "the citizenship of each plaintiff is diverse from the citizenship of each defendant." Caterpillar Inc. v. Lewis, 519 U.S. 61, 68 (1996).

When asked at oral argument whether any of the members of SMS are citizens of Pennsylvania, defendant's counsel replied that all of them reside in and are citizens of Israel. (Tr. at 3.) Therefore, there is complete diversity in this case.

2018 for $192,828.29, and the third invoice was in January 2019 for $106,997.46. (Id. at 2.) The first three invoices were paid in full. (Id.) According to SMS, they were paid by Prime. (Proposed Amended Answer and Counterclaims ("Proposed Am. Answer"), Dkt. No. 27-1, at 2.) A fourth invoice for $300,281.83, Invoice No. 323 for services allegedly rendered in the second part of January 2019, was not paid, and it is the subject of VTS's Second Amended Complaint. (Second Am. Compl. ¶¶ 10-11.) Pursuant to paragraph 8 of the Agreement, SMS can dispute charges no later than seven days from the date of invoice. (Id. ¶ 12, Ex. 1.) SMS did not dispute any of the charges on Invoice No. 323 within seven days from the date of invoice. (Id. ¶ 13.)

SMS denies that there was a binding agreement between it and VTS. It contends that "the person who placed the electronic signature on the Agreement was not an authorized signatory for SMS, and VTS knew, or should have known, that this person lacked the authority." (Answer ¶¶ 1-2.) SMS also now claims that it has reviewed its own files of all the calls that were the subject of the Four Invoices and has determined that "most, if not all of the calls for which VTS had billed SMS in the Four Invoices had never left VTS's network and had never entered a 'pipeline' to their final destination, namely Morocco." (Def.'s Mot. at 2.) Therefore, it contends that "VTS should never have billed SMS for any of these calls" and that "all Four Invoices were fraudulently issued by VTS for services that VTS did not provide to SMS." (Id.)

During discovery, SMS requested that VTS produce Call Detail Records ("CDRs")[3] of all the calls for which VTS sent the Four Invoices to SMS. VTS disclosed a

---

[3] A CDR is a data record consisting of a line item of data produced by a telecommunications computerized system that documents the details of a telephone call passing through a particular telecommunications exchange or "pipeline." The record contains various attributes of the call, such as time, duration, completion status, source number, and destination number. (Pl.'s Mem. at 5 n.2.)

summary report, allegedly showing that a significant number of calls were completed, and that VTS only billed SMS for "actual, completed" calls. (See Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Amend, dated Feb. 4, 2020 ("Pl.'s Mem."), Dkt. No. 30, at 4-5; Declaration of Shira R. Grossman, Esq., dated Feb. 4, 2020, ("Grossman Decl."), ¶¶ 2-3, Ex. 1.) However, VTS ultimately admitted that its third-party provider, 46Labs, had automatically purged the raw data for the CDRs ninety days after the calls were made. (See Letter of Shira Rosenfeld Grossman, Esq., dated Dec. 30, 2019, Dkt. No. 27-6.) SMS claims, and says it plans to provide expert testimony to prove, that it is standard practice in the industry to retain all CDRs. (Def.'s Mot. at 5.)

       SMS now moves for leave to amend its answer to assert counterclaims against VTS for breach of contract and fraudulent misrepresentation.[4] It seeks the return of the payments made on the first three invoices, totaling $487,835.94, for services it claims VTS had not rendered to SMS. (Id. at 3.)

       VTS argues that SMS's amendments are futile because the proposed counterclaims fail to state a claim. It also argues that the amendment should be denied on the grounds of undue delay and prejudice, since SMS had previously denied the existence of the Agreement. (Pl.'s Mem. at 2.) It contends that allowing the amendment "will require VTS to restart discovery because the proposed amendment involves telecommunication services for three additional invoices that were not previously an issue in this action." (Id.)

---

[4] SMS originally moved for leave to add the affirmative defense of spoliation based on the purged CDRs. At oral argument, SMS withdrew that part of its motion. (See Minute Entry, dated Mar. 4, 2020.)

**DISCUSSION**

A. Standard for Motion to Amend

Under Rule 15 of the Federal Rules of Civil Procedure, leave to amend should be "freely give[n] . . . when justice so requires." FED. R. CIV. P. 15(a)(2). The Second Circuit has instructed that the standard for leave to amend pleadings is permissive, consistent with a strong preference for resolving disputes on the merits. See Williams v. Citigroup Inc., 659 F.3d 208, 212–13 (2d Cir. 2011). However, leave to amend may be denied if the amendment would be futile or would result in prejudice or undue delay. See Foman v. Davis, 371 U.S. 178, 182 (1962); McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007); Schoolcraft v. City of New York, 10 CV 6005, 2012 WL 3960118, at *3 (S.D.N.Y. Sept. 10, 2012).

Generally, a proposed amendment is futile if it is clearly frivolous or meritless, or fails to raise at least colorable grounds for relief. U.M.G. Recordings, Inc. v. Lindor, 05 CV 1095, 2006 WL 3335048, at *2 (E.D.N.Y. Nov. 9, 2006) (citation omitted). The analysis is similar to that employed on a motion to dismiss. Id.; see also Johnson v. Wave Comm GR LLC, No. 10 CV 346, 2011 WL 13134625, at *3 (N.D.N.Y. Sept. 27, 2011). The court must accept the asserted facts as true and construe them in the light most favorable to the amending party. Lindor, 2006 WL 3335048, at *2.

B. Counterclaims for Breach of Contract and Fraudulent Misrepresentation

Defendant seeks to amend its answer to assert counterclaims for breach of contract and fraudulent misrepresentation. Under New York law, "[t]he essential elements of a cause of action to recover damages for breach of contract are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of its contractual obligations, and damages resulting from the breach." PFM Packaging Mach. Corp. v. ZMY

5

Food Packing, Inc., 16 N.Y.S.3d 298, 300-01 (2d Dep't 2015). A claim for fraudulent misrepresentation has five elements: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." Crigger v. Fahnestock and Co., 443 F.3d 230, 234 (2d Cir. 2006). Additionally, parties alleging fraud must follow the heightened pleading standards of Federal Rule of Civil Procedure 9(b). Rule 9(b) requires that a fraud claim identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. See, e.g., Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 108 (2d Cir. 2012). Conditions of a person's mind — such as malice, intent, or knowledge — may be alleged generally. Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001) (citing FED. R. CIV. P. 9(b)). Accepting the well-pleaded allegations in the proposed amended answer as true, and construing them in the light most favorable to defendant, the claims are sufficient on their face.

Plaintiff argues that the proposed breach of contract claim is futile because defendant has maintained that there was no enforceable contract between the parties. However, defendant does not concede that there was a binding agreement between it and VTS. Its counterclaims are based on the assumption that, despite its denial that there was a binding agreement between the parties, the court could ultimately find one to have existed. Defendant asserts in its proposed amended answer:

> SMS denies that it ever negotiated or had a meeting of the minds with VTS to enter into the Agreement with VTS. SMS maintains it had no contact with VTS until weeks after the alleged effective date of the Agreement. The Agreement was negotiated between VTS and [Prime]. The only party receiving VTS's telecommunication services under the Agreement was Prime. Therefore, the only party that was enriched under the Agreement was Prime. Accordingly, Prime is the only party that should be

6

> liable for any payments under the Agreement. Furthermore, SMS denies that the Agreement with VTS is a binding agreement under contract law since the person who placed the electronic signature on the Agreement was not an authorized signatory for SMS, and VTS knew, or should have known, that this person lacked the authority.

(Proposed Am. Answer ¶ 1.) It goes on to allege:

> Even arguendo, if [ ]the Court determines that the Agreement was binding, after being challenged by SMS as to whether the parties in fact entered into the Agreement, VTS verbally agreed to modify the terms of the Agreement so that SMS would never be obligated to make payments. Under the terms of this modified Agreement, the only entity to be liable for payments was to be Prime, an entity controlled by Fasal Khan, and not SMS. In fact, per the Modified Agreement, Prime made direct payments to VTS at least three times: the first invoice paid directly by Prime was in November of 2018, invoice no. 176 for $187,698.17 ; the second invoice was in December 2018, invoice no. 228 for $192,828.29; the third invoice was in January 2019, invoice no. 263 for $106,997.46. Under the terms of the Modified Agreement, Prime made direct payments to VTS. The fourth invoice, invoice no. 323, was also Prime's responsibility and not SMS's responsibility, but Prime apparently failed to pay it. VTS seeks to breach the Modified Agreement by seeking payment of invoice no. 323 from SMS, and not directly from Prime, the sole party that was enriched by VTS's telecommunication services under the Agreement and specifically for any alleged services provided under invoice no. 323.

(Id.) This is an example of "pleading in the alternative," which is an acceptable practice. See Kruse v. Wells Fargo Home Mortg., Inc., 383 F.3d 49, 55 n.3 (2d Cir. 2004) (noting that the Federal Rules "permit[ ] pleading inconsistent theories in the alternative").

In arguing that the counterclaims would be futile, plaintiff also relies on paragraph 10 of the Agreement, which expressly prohibits claims by SMS against VTS arising out of or relating to fraudulent calls:

> 10. FRAUDULENT CALLS
>
> a) The Provider [VTS] shall not be responsible or liable for any interruption, diminution, or failure of service, in whole or in part,

> and in no event shall the Provider be responsible or liable for any incidental or consequential damages incurred by Customer or any user of Customer's service.
> b) Customer shall indemnify and hold the Provider harmless from and against all costs, expenses, losses, damages, claims and actions of any kind arising from or related to fraudulent calls of any nature which may comprise a portion of the Service to the extent that the Party claiming the call(s) in question to be fraudulent is (or was at the time of the call) a Customer or end-user of the Service. Customer shall not be excused from paying the Provider for Service provided to Customer, or any portion thereof, on the basis that fraudulent calls comprised a corresponding portion of the Service.

(Agreement ¶ 10.) Plaintiff argues that, as long as defendant acknowledges the existence of the Agreement, it cannot allege that fraudulent calls were made. Defendant argues in response that there is a difference between "fraudulent calls," such as computer-generated robo-calls, and fraudulent invoices for calls that never happened. According to defendant,

> even if the Court were to determine that SMS is bound by the terms of the alleged Agreement, the provisions of Paragraph 10 are not a shield against SMS's claims against VTS. Paragraph 10 of the alleged Agreement contains a standard clause in telecommunication agreements. The plain meaning of this paragraph is that the vendor is protected from claims of fraudulent calls when someone has been able to send stolen calls, or break into the customer's network and send fraudulent calls. In such an instance, the vendor is protected (in our case, VTS) and the customer (in our case, SMS) must pay the vendor.
>
> However, Paragraph 10 does not shield a vendor when the vendor defrauds its customer by billing its customer for calls that the vendor claims that it sent to Morocco when in fact the calls never left its internal IVR system. SMS has been consistently clear in both the Amended Answer and in its Motion papers that it is not arguing that it is not required to pay VTS because the calls in question were "fraudulent calls." Rather, SMS is alleging that VTS issued fraudulent bills for services that VTS never provided to SMS. Namely, VTS never placed the calls in question in the international pipeline and on to the Moroccan Telecommunication Network, rather the calls VTS billed SMS for never left VTS's internal network. Under the terms of the alleged Agreement, VTS could not bill for such internal calls.

8

(Defendant's Reply Ltr., filed Feb. 27, 2020 ("Def.'s Reply Ltr.") , Dkt. No. 33 at 3-4.)

If, as plaintiff argues, the contract precludes defendant from contending that the invoices were fraudulent on the ground that the calls never went through, then the counterclaims may ultimately fail. But that would be a final ruling on the merits of the case, and it does not render defendant's claims implausible. Accordingly, I find that defendant's claims of breach of contract and fraudulent misrepresentation are not futile.

C. Prejudice and Undue Delay

"Mere delay, . . . absent a showing of bad faith or undue prejudice, does not provide a basis for the district court to deny the right to amend." State Teachers Ret. Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir.1981) (citation omitted). Bad faith exists "when a party attempts to amend its pleading for an improper purpose." Laurent v. PricewaterhouseCoopers LLP, No. 06 CV 2280, 2012 WL 3614043, at *4 (S.D.N.Y. Aug. 15, 2012) (citing Foman, 371 U.S. at 182). Prejudice may exist when the amendment would: "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; [or] (ii) significantly delay the resolution of the dispute. . . ." Monahan v. New York City Dep't of Corr., 214 F.3d 275, 284 (2d Cir. 2000) (internal quotation marks and citation omitted). However, the need to take additional discovery, standing alone, "is not a sufficient basis for denying a request for leave to amend, particularly when the trial has not commenced and is not likely to commence for some time." Laurent, 2012 WL 3614043, at *4 (citing Silberblatt, Inc v. E. Harlem Pilot Block–Bldg. 1 Hous. Dev. Fund Co., 608 F.2d 28, 42 (2d Cir. 1979). Prejudice to the opposing party is the most important factor a court must consider when determining whether to grant a

9

motion to amend. Id. (citing 6 Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1487 (3d. 2010)).

SMS contends that the reason for its delay in moving to amend and add counterclaims is that VTS only disclosed the CDR summary reports in February 2020 (for thirteen out of the approximately ninety days covered by the Four Invoices). (See Affirmation of Israel Letzter, sworn to Feb. 17, 2020, Dkt. No. 33-1, ¶¶ 4, 22.) SMS argues that the summaries "prove that VTS did not switch (direct or point) the phone calls to the international pipeline and send the calls to Morocco." (Defendant's Reply Ltr. at 2.) It explains:

> This is proven based on the fact that the PDDs (or Post Dialing Delay, which is the time between the start of the call and the moment the phone of the called party starts ringing) on the CDR Summaries reflect the fact that all the calls contained in the CDR Summaries over a three-month period of time had PDDs of less than half a second which is a physical impossibility for international calls to Morocco. Therefore, the only way that the calls could have had PDDs of less than half a second is if the calls never left VTS's internal network.

(Id.)

Plaintiff does not allege bad faith on defendant's part. It merely contends that granting SMS's motion will prompt SMS to seek additional discovery. That argument is unavailing, since a party's need for additional discovery is not, without more, sufficiently prejudicial to warrant denying a motion to amend. Laurent, 2012 WL 3614043, at *4 (citing Silberblatt, 608 F.2d at 42).

## CONCLUSION

Defendant's motion to amend its answer and assert counterclaims for breach of contract and fraudulent misrepresentation is granted. The parties are directed to meet and confer

10

on a new case management schedule, and to submit a joint status report by June 19, 2020.  The parties will advise as to whether a telephone conference is necessary.

       SO ORDERED.

Dated:  Brooklyn, New York
       June 1, 2020

                                                                    /s/
                                            ROBERT M. LEVY
                                            United States Magistrate Judge